**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| DAVID BROWN, derivatively on behalf of KYNDRYL HOLDINGS, INC.,<br><br>Plaintiffs,<br>v.<br><br>MARTIN SCHROETER, DOMINIC J. CARUSO, JOHN D. HARRIS II, STEPHEN A.M. HESTER, SHIRLEY ANN JACKSON, JANINA KUGEL, DENIS MACHUEL, RAHUL N. MERCHANT, JANA SCHREUDER, HOWARD I. UNGERLEIDER, DAVID B. WYSHNER, EDWARD SEBOLD, and VINEET KHURANA,<br><br>Defendants,<br><br>-and-<br><br>KYNDRYL HOLDINGS, INC.,<br><br>Nominal Defendant. | ) | Case No.<br><br>**VERIFIED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff David Brown ("Plaintiff"), derivatively on behalf of Kyndryl Holdings, Inc. ("Kyndryl" or the "Company"), brings the following verified complaint against the Company's board of directors (the "Board") and executive officers for breaches of fiduciary duties, gross mismanagement, waste of corporate assets, unjust enrichment, and violation of Section 14(a) of the Securities Exchange Act of 1934. Except for allegations specifically pertaining to Plaintiff and Plaintiff's own acts, the allegations in the Complaint are based upon information and belief, which include but are not limited to: (i) the Company's public filings with the United States Securities and Exchange Commission (the "SEC"); (ii) pleadings filed in *Brander v. Kyndryl Holdings. Inc. et al,* Case No.: 26-cv-782 (E.D.N.Y.) (the "Securities Class Action"); (iii) corporate governance documents available on the Company's website; (iv) media reports; and (v) other publicly available information.

## NATURE OF THE ACTION

1. This is a stockholder derivative action brought by Plaintiff, a stockholder of Kyndryl, on behalf of the Company against the Defendants, as defined herein. This action alleges breaches of fiduciary duty by the Board and senior executive officers occurring from at least April 1, 2024 to February 9, 2026 (the "Relevant Time Period").

2. Kyndryl is the world's largest provider of IT infrastructure services. The Company offers cloud services, applications, network coverage, security services, and artificial intelligence services mainly for customers in the financial services industries, with customers from healthcare companies, the industrial sector, retail, and media companies more equally represented. Kyndryl began operating in 2021, after International Business Machines Corporation spun off the infrastructure services unit of its Global Technology Services segment.

3. On February 9, 2026, the Company filed a Notification of Late Filing on Form 12b-5 (the "NT 10-Q"), notifying the SEC and its investors that the Company could not file its Form 10-Q for the quarter ending on December 31, 2025, on a timely basis. In addition to revealing that its Audit Committee had begun an investigation into the Company's cash management practices and related disclosures, the Company disclosed that the SEC had opened its own investigation into these issues. The Company also stated that it would be reporting material weaknesses in its internal controls over financial reporting for the fiscal year ending March 31, 2025, and the three subsequent quarters. That same day, Kyndryl announced that its Chief Financial Officer ("CFO") and General Counsel would be leaving the Company, and the Senior Vice President and Global Controller would be reassigned. Kyndryl's stock price plummeted over 55% on this news and a federal securities fraud class action was filed against the Company.

4. Through this action, Plaintiff seeks to hold the Board and executive officers accountable for making or causing the Company to make false and misleading statements, as well as the inadequate internal controls that allowed the misconduct to occur, in breach of their fiduciary duties to the Company.

## PARTIES

### A. Plaintiff

5. Plaintiff David Brown is a current shareholder of Kyndryl and has continuously held Kyndryl stock during all times relevant hereto and is committed to retaining Kyndryl shares through the pendency of this action to preserve his standing. Plaintiff will adequately and fairly represent the interests of Kyndryl and its shareholders in enforcing its rights.

### B. Nominal Defendant

6. Nominal Defendant Kyndryl is a corporation organized and existing under the laws of the State of Delaware. The Company's principal executive offices are located at 1 Vanderbilt Avenue, 15th Floor, New York, NY 10017. Kyndryl common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "KD."

### C. Individual Defendants

7. Defendant Martin Schroeter has been CEO and a director of the Company since 2021.

8. Defendant Dominick J. Caruso has been a director of the Company since 2021.

9. Defendant John D. Harris II has been a director of the Company since 2021.

10. Defendant Stephen A.M. Hester has been a director of the Company since 2021.

11. Defendant Shirley Ann Jackson has been a director of the Company since 2021.

12. Defendant Janina Kugel has been a director of the Company since 2021.

13. Defendant Denis Machuel has been a director of the Company since 2021.

14. Defendant Rahul N. Merchant has been a director of the Company since 2021.

15. Defendant Jana Schreuder has been a director of the Company since 2021.

16. Defendant Howard I. Ungerleider has been a director of the Company since 2021.

17. Defendants Schroeter, Caruso, Harris, Hester, Jackson, Kugel, Machuel, Merchant, Schreuder, and Ungerleider are herein referred to as "Director Defendants."

18. Defendant David B. Wyshner served as the Company's CFO from September 2021 to February 2026.

19. Defendant Edward Sebold served as General Counsel and Secretary of the Company from November 2021 to February 2026.

20. Defendant Vineet Khurana served as the Company's Corporate Controller and Principal Accounting Officer from May 2021 to February 2026, and currently serves as SVP, Business Operations.

21. Defendants Schroeter, Wyshner, Sebold and Khurana are herein referred to as "Officer Defendants."

## JURISDICTION AND VENUE

22. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a)(1), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9.

23. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

24. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either

present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

25. Venue is proper in this court under 28 U.S.C. § 1391, because a significant amount of the conduct at issue took place and had an effect in this District.

## FURTHER SUBSTANTIVE ALLEGATIONS

### A. Background of the Misconduct

26. As a publicly traded company, Kyndryl is required to comply with Generally Accepted Accounting Principles ("GAAP"). GAAP is a set of accounting rules and procedures used in financial reporting, which can be found in SEC Rules and interpretive releases, as well as the Financial Accounting Standards Board's Accounting Standards Codification ("ASC"). ASC Topic 230, Statement of Cash Flows, allows investors to understand a company's financial performance and to assess that company's ability to meet its obligations and generate future cash flows. In order to provide transparency, GAAP, and specifically ASC 230, requires Kyndryl to disclose to investors information about the amounts of cash receipts and cash payments during a specified period, and must classify them as relating to investing, financing, or operating activities.

27. Companies are required to disclose their cash flow statements in their financial statements. Free cash flow, however, is a non-GAAP measure that, throughout the Relevant Time Period, the Company repeatedly touted as crucial for investors to understand the Company's financial performance.

28. On February 9, 2026, Kyndryl revealed that the Audit Committee of the Board was "reviewing [Kyndryl's] cash management practices, related disclosures (including regarding the drivers of the Company's adjusted free cash flow metric)," and the "efficacy of the Company's

internal control over financial reporting." In the Form 10-Q filed with the SEC on February 17, 2026, the Company disclosed that the "cash management practices" at issue involved "deferring vendor payments quarter to quarter."

**B. The False and Misleading Statements**

29. From at least August 7, 2024, through February 9, 2026, the Defendants made or caused Kyndryl to make, materially false and misleading statements about the Company's calculation of free cash flows and the adequacy of the Company's internal controls over financial reporting.

30. On August 7, 2024, Kyndryl filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2024 (the "1Q25 Report"). Attached to the 1Q25 Report were certifications pursuant to The Sarbanes Oxley Act of 2002 ("SOX") signed by Defendants Schroeter and Wyshner attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

31. Defendant Khurana was the authorized signatory of the 1Q25 Report pursuant to the requirements of the Securities Exchange Act of 1934 (the "Exchange Act").

32. The 1Q25 Report contained the following statement regarding the Company's evaluation of its disclosure controls and procedures:

> The Company's management evaluated, with the participation of the Chief Executive Officer and Chief Financial Officer, the effectiveness of the Company's disclosure controls and procedures (as such term is defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this report. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that ***the Company's disclosure controls and procedures were not effective as of the end of the period covered by this report due to a material weakness in internal control over financial reporting in the area of our information technology general controls ("ITGCs") that was disclosed in Part II, Item 9A of the Company's Form 10-K.*** The deficiencies in

> ITGCs were related to access and program development and change management controls associated with the Company's large-scale migration in a compressed timeframe of its internal operating systems to a new enterprise resource planning system, which was required to replace the systems temporarily being made available to the Company by our former Parent following our Spin-off. These control deficiencies did not result in a misstatement to the annual or interim consolidated financial statements previously filed or included in this Form 10-Q.
>
> ***There have been no changes in the Company's internal control over financial reporting (as such term is defined in Rule 13a-15(f) of the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting other than the ongoing remediation of the ITGC deficiencies described below.***

(Emphasis added).

33. This statement was materially false and misleading at the time it was made because the Company downplayed its issues with its internal controls over financial reporting by only stating the deficiencies in ITGCs.

34. The 1Q25 Report included, in pertinent part, the following consolidated statement of cash flows:

**KYNDRYL HOLDINGS, INC.**
**CONSOLIDATED STATEMENT OF CASH FLOWS**
**(Dollars in millions)**
**(Unaudited)**

| | Three Months Ended June 30, 2024 | Three Months Ended June 30, 2023 |
|---|---|---|
| **Cash flows from operating activities:** | | |
| Net income (loss) | $ 11 | $ (141) |
| Adjustments to reconcile net income (loss) to cash provided by operating activities: | | |
| Depreciation and amortization: | | |
| Depreciation of property, equipment and capitalized software | 127 | 210 |
| Depreciation of right-of-use assets | 70 | 91 |
| Amortization of transition costs and prepaid software | 310 | 325 |
| Amortization of capitalized contract costs | 107 | 138 |
| Amortization of acquisition-related intangible assets | 7 | 8 |
| Stock-based compensation | 24 | 22 |
| Deferred taxes | 17 | 26 |
| Net (gain) loss on asset sales and other | 27 | 29 |
| Change in operating assets and liabilities: | | |
| Deferred costs (excluding amortization) | (363) | (418) |
| Right-of-use assets and liabilities (excluding depreciation) | (65) | (103) |
| Workforce rebalancing liabilities | 7 | (23) |
| Receivables | 163 | 53 |
| Accounts payable | (122) | (143) |
| Taxes | (9) | (25) |
| Other assets and other liabilities | (358) | (222) |
| **Net cash provided by (used in) operating activities** | $ (48) | $ (173) |
| **Cash flows from investing activities:** | | |
| Capital expenditures | $ (122) | $ (100) |
| Proceeds from disposition of property and equipment | 24 | 6 |
| Acquisitions and divestitures, net of cash acquired | (46) | — |
| Other investing activities, net | (22) | (19) |
| **Net cash used in investing activities** | $ (166) | $ (113) |
| **Cash flows from financing activities:** | | |
| Debt repayments | $ (38) | $ (30) |
| Common stock repurchases for tax withholdings | (7) | (7) |
| Other financing activities, net | (6) | (1) |
| **Net cash provided by (used in) financing activities** | $ (51) | $ (38) |
| Effect of exchange rate changes on cash, cash equivalents and restricted cash | $ (17) | $ (15) |
| Net change in cash, cash equivalents and restricted cash | $ (281) | $ (339) |
| Cash, cash equivalents and restricted cash at beginning of period | $ 1,554 | $ 1,860 |
| **Cash, cash equivalents and restricted cash at end of period** | $ 1,273 | $ 1,521 |
| **Supplemental data** | | |
| Income taxes paid, net of refunds received | $ 54 | $ 65 |
| Interest paid on debt | $ 40 | $ 46 |

The accompanying notes are an integral part of the financial statements.

35. On November 7, 2024, Kyndryl filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2024 (the "2Q25 Report"). Attached to the 2Q25 Report

were certifications pursuant to SOX signed by Defendants Schroeter and Wyshner attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

36. Defendant Khurana was the authorized signatory of the 2Q25 Report pursuant to the requirements of the Exchange Act.

37. The 2Q25 Report contained the following statement regarding the Company's evaluation of its disclosure controls and procedures:

> The Company's management evaluated, with the participation of the Chief Executive Officer and Chief Financial Officer, the effectiveness of the Company's disclosure controls and procedures (as such term is defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this report. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that ***the Company's disclosure controls and procedures were not effective as of the end of the period covered by this report due to a material weakness in internal control over financial reporting in the area of our information technology general controls ("ITGCs") that was disclosed in Part II, Item 9A of the Company's Form 10-K.*** The deficiencies in ITGCs were related to access and program development and change management controls associated with the Company's large-scale migration in a compressed timeframe of its internal operating systems to a new enterprise resource planning system, which was required to replace the systems temporarily being made available to the Company by our former Parent following our Spin-off. These control deficiencies did not result in a misstatement to the annual or interim consolidated financial statements previously filed or included in this Form 10-Q.
>
> ***There have been no changes in the Company's internal control over financial reporting (as such term is defined in Rule 13a-15(f) of the Exchange Act) that occurred during the quarter ended September 30, 2024 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting other than the ongoing remediation of the ITGC deficiencies described below.***

(Emphasis added).

38. This statement was materially false and misleading at the time it was made because the Company downplayed its issues with internal control over financial reporting by only stating the deficiencies in ITGCs.

39. The 2Q25 Report included, in pertinent part, the following consolidated statement of cash flows:

**KYNDRYL HOLDINGS, INC.**
**CONSOLIDATED STATEMENT OF CASH FLOWS**
**(Dollars in millions)**
**(Unaudited)**

| | Six Months Ended September 30, 2024 | 2023 |
|---|---|---|
| **Cash flows from operating activities:** | | |
| Net income (loss) | $ (32) | $ (283) |
| Adjustments to reconcile net income (loss) to cash provided by operating activities: | | |
| Depreciation and amortization: | | |
| Depreciation of property, equipment and capitalized software | 276 | 431 |
| Depreciation of right-of-use assets | 154 | 173 |
| Amortization of transition costs and prepaid software | 647 | 631 |
| Amortization of capitalized contract costs | 205 | 281 |
| Amortization of acquisition-related intangible assets | 17 | 15 |
| Stock-based compensation | 49 | 48 |
| Deferred taxes | 17 | 51 |
| Net (gain) loss on asset sales and other | (14) | 22 |
| Change in operating assets and liabilities: | | |
| Deferred costs (excluding amortization) | (852) | (699) |
| Right-of-use assets and liabilities (excluding depreciation) | (145) | (195) |
| Workforce rebalancing liabilities | (13) | (18) |
| Receivables | 193 | (110) |
| Accounts payable | (237) | (494) |
| Taxes | (31) | (55) |
| Other assets and other liabilities | (133) | 75 |
| **Net cash provided by (used in) operating activities** | $ 101 | $ (127) |
| **Cash flows from investing activities:** | | |
| Capital expenditures | $ (256) | $ (275) |
| Proceeds from disposition of property and equipment | 54 | 119 |
| Acquisitions and divestitures, net of cash acquired | (46) | — |
| Other investing activities, net | 7 | (53) |
| **Net cash used in investing activities** | $ (241) | $ (208) |
| **Cash flows from financing activities:** | | |
| Debt repayments | $ (73) | $ (67) |
| Common stock repurchases for tax withholdings | (24) | (12) |
| Other financing activities, net | (5) | (1) |
| **Net cash provided by (used in) financing activities** | $ (101) | $ (80) |
| Effect of exchange rate changes on cash, cash equivalents and restricted cash | $ 17 | $ (33) |
| Net change in cash, cash equivalents and restricted cash | $ (224) | $ (448) |
| Cash, cash equivalents and restricted cash at beginning of period | $ 1,554 | $ 1,860 |
| **Cash, cash equivalents and restricted cash at end of period** | $ 1,330 | $ 1,412 |
| **Supplemental data** | | |
| Income taxes paid, net of refunds received | $ 89 | $ 88 |
| Interest paid on debt | $ 60 | $ 59 |

The accompanying notes are an integral part of the financial statements.

40. On February 6, 2025, Kyndryl filed with the SEC its quarterly report on Form 10-Q for the period ended December 31, 2024 (the "3Q25 Report"). Attached to the 3Q25 Report were certifications pursuant to SOX signed by Defendants Schroeter and Wyshner attesting to the

accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

41. Defendant Khurana was the authorized signatory of the 3Q25 Report pursuant to the requirements of the Exchange Act.

42. The 3Q25 Report contained the following statement regarding the Company's evaluation of its disclosure controls and procedures:

> The Company's management evaluated, with the participation of the Chief Executive Officer and Chief Financial Officer, the effectiveness of the Company's disclosure controls and procedures (as such term is defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this report. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that ***the Company's disclosure controls and procedures were not effective as of the end of the period covered by this report due to a material weakness in internal control over financial reporting in the area of our information technology general controls ("ITGCs") that was disclosed in Part II, Item 9A of the Company's Form 10-K.*** The deficiencies in ITGCs were related to access and program development and change management controls associated with the Company's large-scale migration in a compressed timeframe of its internal operating systems to a new enterprise resource planning system, which was required to replace the systems temporarily being made available to the Company by our former Parent following our Spin-off. These control deficiencies did not result in a misstatement to the annual or interim consolidated financial statements previously filed or included in this Form 10-Q.
>
> ***There have been no changes in the Company's internal control over financial reporting (as such term is defined in Rule 13a-15(f) of the Exchange Act) that occurred during the quarter ended December 31, 2024 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting other than the ongoing remediation of the ITGC deficiencies described below.***

(Emphasis added).

43. This statement was materially false and misleading at the time it was made because the Company downplayed its issues with internal control over financial reporting by only stating the deficiencies in ITGCs.

44. The 3Q25 Report included, in pertinent part, the following consolidated statement of cash flows:

**KYNDRYL HOLDINGS, INC.**
**CONSOLIDATED STATEMENT OF CASH FLOWS**
**(Dollars in millions)**
**(Unaudited)**

| | Nine Months Ended December 31, 2024 | Nine Months Ended December 31, 2023 |
|---|---|---|
| **Cash flows from operating activities:** | | |
| Net income (loss) | $ 183 | $ (295) |
| Adjustments to reconcile net income (loss) to cash provided by operating activities: | | |
| Depreciation and amortization: | | |
| Depreciation of property, equipment and capitalized software | 471 | 639 |
| Depreciation of right-of-use assets | 220 | 251 |
| Amortization of transition costs and prepaid software | 974 | 946 |
| Amortization of capitalized contract costs | 314 | 418 |
| Amortization of acquisition-related intangible assets | 23 | 23 |
| Stock-based compensation | 78 | 72 |
| Deferred taxes | 22 | 55 |
| Net (gain) loss on asset sales and other | (108) | (6) |
| Change in operating assets and liabilities: | | |
| Deferred costs (excluding amortization) | (1,273) | (1,023) |
| Right-of-use assets and liabilities (excluding depreciation) | (212) | (269) |
| Workforce rebalancing liabilities | (22) | (28) |
| Receivables | 177 | (13) |
| Accounts payable | (265) | (339) |
| Taxes | (39) | (33) |
| Other assets and other liabilities | (183) | (90) |
| **Net cash provided by operating activities** | $ 361 | $ 309 |
| **Cash flows from investing activities:** | | |
| Capital expenditures | $ (365) | $ (449) |
| Proceeds from disposition of property and equipment | 70 | 134 |
| Acquisitions and divestitures, net of cash acquired | 137 | — |
| Other investing activities, net | (42) | (35) |
| **Net cash used in investing activities** | $ (199) | $ (350) |
| **Cash flows from financing activities:** | | |
| Debt repayments | $ (108) | $ (103) |
| Common stock repurchases | (30) | — |
| Common stock repurchases for tax withholdings | (32) | (19) |
| Other financing activities, net | (2) | (1) |
| **Net cash used in financing activities** | $ (172) | $ (123) |
| Effect of exchange rate changes on cash, cash equivalents and restricted cash | $ (39) | $ (5) |
| Net change in cash, cash equivalents and restricted cash | $ (49) | $ (169) |
| Cash, cash equivalents and restricted cash at beginning of period | $ 1,554 | $ 1,860 |
| **Cash, cash equivalents and restricted cash at end of period** | $ 1,505 | $ 1,691 |
| **Supplemental data** | | |
| Income taxes paid, net of refunds received | $ 123 | $ 140 |
| Interest paid on debt | $ 100 | $ 108 |

The accompanying notes are an integral part of the financial statements.

45. On May 30, 2025, Kyndryl filed with the SEC its 2025 full year report on Form 10-K for the year ended March 31, 2025 (the "2025 Annual Report"). Attached to the 2025 Annual Report were certifications pursuant to SOX signed by Defendants Schroeter and Wyshner attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

46. The 2025 Annual Report contained the following statement regarding the Company's evaluation of its disclosure controls and procedures:

> The Company's management evaluated, with the participation of the Chief Executive Officer and Chief Financial Officer, the effectiveness of the Company's disclosure controls and procedures (as such term is defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of March 31, 2025, the end of the period covered by this report. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer ***have concluded that the Company's disclosure controls and procedures were effective as of the end of the period covered by this report.***
>
> * * *
>
> Management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our internal control over financial reporting as of March 31, 2025. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control - Integrated Framework (2013). ***Based on this evaluation, management concluded that, as of March 31, 2025, our internal control over financial reporting was effective.***
>
> * * *
>
> ***There have been no changes in the Company's internal control over financial reporting (as such term is defined in Rule 13a-15(f) of the Exchange Act) that occurred during the quarter ended March 31, 2025 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting other than the remediation of our information technology general controls as part of our previously disclosed remediation activities.***

(Emphasis added).

47. This statement was materially false and misleading at the time it was made because the Company stated the 2025 Annual Report's disclosure controls and procedures were effective and were unlikely to affect the Company's internal control over financial reporting, when in reality there were material weaknesses in the Company's internal controls over financial reporting with respect to cash management practices and financial disclosure processes.

48. The 2025 Annual Report included, in pertinent part, the following consolidated statement of cash flows:

**KYNDRYL HOLDINGS, INC.**
**CONSOLIDATED STATEMENT OF CASH FLOWS**
**(Dollars in millions)**

| | Year Ended March 31, 2025 | 2024 | 2023 |
|---|---|---|---|
| **Cash flows from operating activities:** | | | |
| Net income (loss) | $ 252 | $ (340) | $ (1,374) |
| Adjustments to reconcile net income (loss) to cash provided by operating activities: | | | |
| Depreciation and amortization: | | | |
| Depreciation of property, equipment and capitalized software | 660 | 834 | 900 |
| Depreciation of right-of-use assets | 327 | 319 | 428 |
| Amortization of transition costs and prepaid software | 1,278 | 1,256 | 1,199 |
| Amortization of capitalized contract costs | 420 | 531 | 472 |
| Amortization of acquisition-related intangible assets | 30 | 30 | 46 |
| Stock-based compensation | 100 | 95 | 113 |
| Deferred taxes | (1) | (13) | 285 |
| Net (gain) loss on asset sales and other | (152) | 43 | 6 |
| Change in operating assets and liabilities: | | | |
| Deferred costs (excluding amortization) | (1,762) | (1,569) | (1,592) |
| Right-of-use assets and liabilities (excluding depreciation) | (314) | (335) | (361) |
| Workforce rebalancing liabilities | (25) | (38) | 41 |
| Receivables | 289 | 11 | 664 |
| Accounts payable | (89) | (305) | 282 |
| Taxes | (1) | (2) | 90 |
| Other assets and other liabilities | (71) | (63) | (415) |
| **Net cash provided by operating activities** | $ 942 | $ 454 | $ 781 |
| **Cash flows from investing activities:** | | | |
| Capital expenditures | $ (605) | $ (651) | $ (865) |
| Proceeds from disposition of property and equipment | 83 | 138 | 23 |
| Acquisitions and divestitures, net of cash acquired | 139 | — | — |
| Other investing activities, net | (20) | (40) | 7 |
| **Net cash used in investing activities** | $ (404) | $ (553) | $ (835) |
| **Cash flows from financing activities:** | | | |
| Debt repayments | $ (148) | $ (644) | $ (118) |
| Proceeds from issuance of debt, net of debt issuance costs | — | 494 | — |
| Common stock repurchases | (93) | — | — |
| Common stock repurchases for tax withholdings | (45) | (22) | (19) |
| Other financing activities, net | — | 2 | (4) |
| **Net cash used in financing activities** | $ (286) | $ (170) | $ (141) |
| Effect of exchange rate changes on cash, cash equivalents and restricted cash | $ (16) | $ (37) | $ (100) |
| Net change in cash, cash equivalents and restricted cash | $ 235 | $ (306) | $ (294) |
| Cash, cash equivalents and restricted cash at beginning of period | $ 1,554 | $ 1,860 | $ 2,154 |
| **Cash, cash equivalents and restricted cash at end of period** | $ 1,789 | $ 1,554 | $ 1,860 |
| **Supplemental data** | | | |
| Income taxes paid, net of refunds received | $ 149 | $ 191 | $ 167 |
| Interest paid on debt | $ 119 | $ 118 | $ 98 |

The accompanying notes are an integral part of the financial statements.

49. On August 5, 2025, Kyndryl filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2025 (the "1Q26 Report"). Attached to the 1Q26 Report were certifications pursuant to SOX signed by Defendants Schroeter and Wyshner attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

50. Defendant Khurana was the authorized signatory of the 1Q26 Report pursuant to the requirements of the Exchange Act.

51. The 1Q26 Report contained the following statement regarding the Company's evaluation of its disclosure controls and procedures:

> The Company's management evaluated, with the participation of the Chief Executive Officer and Chief Financial Officer, the effectiveness of the Company's disclosure controls and procedures (as such term is defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this report. ***Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were effective as of the end of the period covered by this report.***
>
> ***There have been no changes in the Company's internal control over financial reporting (as such term is defined in Rule 13a-15(f) of the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.***

(Emphasis added).

52. This statement was materially false and misleading at the time it was made because the Company stated the 2Q21 Report's disclosure controls and procedures were effective and were unlikely to affect the Company's internal control over financial reporting, when in reality there was material weaknesses in the Company's internal control over financial reporting with respect to cash management practices and financial disclosure processes.

53. The 1Q26 Report included, in pertinent part, the following consolidated statement of cash flows:

**KYNDRYL HOLDINGS, INC.**
**CONSOLIDATED STATEMENT OF CASH FLOWS**
**(Dollars in millions)**
**(Unaudited)**

| | Three Months Ended June 30, 2025 | Three Months Ended June 30, 2024 |
|---|---|---|
| **Cash flows from operating activities:** | | |
| Net income | $ 56 | $ 11 |
| Adjustments to reconcile net income to cash provided by operating activities: | | |
| Depreciation and amortization: | | |
| Depreciation of property, equipment and capitalized software | 191 | 127 |
| Depreciation of right-of-use assets | 73 | 70 |
| Amortization of transition costs and prepaid software | 308 | 310 |
| Amortization of capitalized contract costs | 106 | 107 |
| Amortization of acquisition-related intangible assets | 7 | 7 |
| Stock-based compensation | 24 | 24 |
| Deferred taxes | (10) | 17 |
| Net (gain) loss on asset sales and other | — | 27 |
| Change in operating assets and liabilities: | | |
| Right-of-use assets and liabilities (excluding depreciation) | (88) | (65) |
| Workforce rebalancing liabilities | 3 | 7 |
| Receivables | 46 | 163 |
| Accounts payable | (269) | (122) |
| Taxes | 27 | (9) |
| Deferred costs (excluding amortization) | (1,381) | (363) |
| Other assets and other liabilities | 781 | (358) |
| **Net cash provided by (used in) operating activities** | $ (124) | $ (48) |
| **Cash flows from investing activities:** | | |
| Capital expenditures | $ (143) | $ (122) |
| Proceeds from disposition of property and equipment | 45 | 24 |
| Acquisitions and divestitures, net of cash acquired | 1 | (46) |
| Other investing activities, net | 22 | (22) |
| **Net cash used in investing activities** | $ (74) | $ (166) |
| **Cash flows from financing activities:** | | |
| Debt repayments | $ (36) | $ (38) |
| Common stock repurchases | (62) | — |
| Common stock repurchases for tax withholdings | (67) | (7) |
| Other financing activities, net | (5) | (6) |
| **Net cash used in financing activities** | $ (170) | $ (51) |
| Effect of exchange rate changes on cash, cash equivalents and restricted cash | $ 46 | $ (17) |
| Net change in cash, cash equivalents and restricted cash | $ (323) | $ (281) |
| Cash, cash equivalents and restricted cash at beginning of period | $ 1,789 | $ 1,554 |
| **Cash, cash equivalents and restricted cash at end of period** | $ 1,466 | $ 1,273 |
| **Supplemental data** | | |
| Income taxes paid, net of refunds received | $ 67 | $ 54 |
| Interest paid on debt | $ 39 | $ 40 |

The accompanying notes are an integral part of the financial statements.

54. On November 5, 2025, Kyndryl filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2025 (the "2Q26 Report"). Attached to the 2Q26 Report were certifications pursuant to SOX signed by Defendants Schroeter and Wyshner attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

55. Defendant Khurana was the authorized signatory of the 2Q26 Report pursuant to the requirements of the Exchange Act.

56. The 2Q26 Report contained the following statement regarding the Company's evaluation of its disclosure controls and procedures:

> The Company's management evaluated, with the participation of the Chief Executive Officer and Chief Financial Officer, the effectiveness of the Company's disclosure controls and procedures (as such term is defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this report. ***Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were effective as of the end of the period covered by this report.***
>
> ***There have been no changes in the Company's internal control over financial reporting (as such term is defined in Rule 13a-15(f) of the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.***

(Emphasis added).

57. This statement was materially false and misleading at the time it was made because the Company stated the 2Q26 Report's disclosure controls and procedures were effective and were unlikely to affect the Company's internal control over financial reporting, when in reality there was material weaknesses in the Company's internal control over financial reporting with respect to cash management practices and financial disclosure processes.

58. The 2Q26 Report included, in pertinent part, the following consolidated statement of cash flows:

**KYNDRYL HOLDINGS, INC.**
**CONSOLIDATED STATEMENT OF CASH FLOWS**
**(Dollars in millions)**
**(Unaudited)**

| | Six Months Ended September 30, 2025 | Six Months Ended September 30, 2024 |
|---|---|---|
| **Cash flows from operating activities:** | | |
| Net income (loss) | $ 124 | $ (32) |
| Adjustments to reconcile net income (loss) to cash provided by operating activities: | | |
| Depreciation and amortization: | | |
| Depreciation of property, equipment and capitalized software | 384 | 276 |
| Depreciation of right-of-use assets | 147 | 154 |
| Amortization of transition costs and prepaid software | 613 | 647 |
| Amortization of capitalized contract costs | 231 | 205 |
| Amortization of acquisition-related intangible assets | 14 | 17 |
| Stock-based compensation | 50 | 49 |
| Deferred taxes | (17) | 17 |
| Net (gain) loss on asset sales and other | — | (14) |
| Change in operating assets and liabilities: | | |
| Right-of-use assets and liabilities (excluding depreciation) | (173) | (145) |
| Workforce rebalancing liabilities | (1) | (13) |
| Receivables | 6 | 193 |
| Accounts payable | (328) | (237) |
| Taxes | 23 | (31) |
| Deferred costs (excluding amortization) | (1,697) | (852) |
| Other assets and other liabilities | 645 | (133) |
| **Net cash provided by operating activities** | $ 22 | $ 101 |
| **Cash flows from investing activities:** | | |
| Capital expenditures | $ (272) | $ (256) |
| Proceeds from disposition of property and equipment | 51 | 54 |
| Acquisitions and divestitures, net of cash acquired | 1 | (46) |
| Other investing activities, net | 26 | 7 |
| **Net cash used in investing activities** | $ (196) | $ (241) |
| **Cash flows from financing activities:** | | |
| Debt repayments | $ (70) | $ (73) |
| Common stock repurchases | (151) | — |
| Common stock repurchases for tax withholdings | (89) | (24) |
| Other financing activities, net | (1) | (5) |
| **Net cash used in financing activities** | $ (310) | $ (101) |
| Effect of exchange rate changes on cash, cash equivalents and restricted cash | $ 30 | $ 17 |
| Net change in cash, cash equivalents and restricted cash | $ (453) | $ (224) |
| Cash, cash equivalents and restricted cash at beginning of period | $ 1,789 | $ 1,554 |
| **Cash, cash equivalents and restricted cash at end of period** | $ 1,336 | $ 1,330 |
| **Supplemental data** | | |
| Income taxes paid, net of refunds received | $ 92 | $ 89 |
| Interest paid on debt | $ 58 | $ 60 |

The accompanying notes are an integral part of the financial statements.

## C. The Truth is Revealed

59. On February 9, 2026, before the market opened, Kyndryl filed the NT 10-Q with the SEC, stating the following:

> The Company, through the Audit Committee of its Board of Directors, ***is reviewing its cash management practices, related disclosures (including regarding the drivers of the Company's adjusted free cash flow metric),*** the efficacy of the

> Company's internal control over financial reporting, and certain other matters following the Company's receipt of voluntary document requests from the Division of Enforcement of the Securities and Exchange Commission ("SEC") relating to such matters. Due to this review, the finalization of the Quarterly Report, including the Company's assessment of internal control over financial reporting, requires additional time to complete.
>
> * * *
>
> In connection with the filing of the Quarterly Report, when made, ***the Company anticipates reporting material weaknesses in the Company's internal control over financial reporting for the period covered in the Quarterly Report, as well as for the full fiscal year ended March 31, 2025, and the first two fiscal quarters of fiscal year 2026, which are expected to include, but may not be limited to, the effectiveness and strength of certain functions at the Company, including with respect to controls related to information and communication and tone at the top. As a result, the Company notes that its assessment of internal control over financial reporting and the related opinion of PricewaterhouseCoopers LLP only with respect to the effectiveness of the Company's internal control over financial reporting as of March 31, 2025 included in the Company's Annual Report on Form 10-K for the full fiscal year ended March 31, 2025 should no longer be relied upon.***

(Emphasis added).

60. Later that day, before the market opened, Kyndryl filed with the SEC a Current Report on Form 8-K. Attached to the 8-K was a press release which stated the following:

> Kyndryl today announced that Harsh Chugh has been named Interim Chief Financial Officer, Mark Ringes has been named Interim General Counsel and Bhavna Doegar has been named Interim Corporate Controller effective immediately.

61. A separately filed Form 8-K stated:

> David Wyshner departed from his position as Chief Financial Officer of the Company, and Edward Sebold departed from his position as General Counsel of the Company, effective immediately. In addition, on the same date, Vineet Khurana stepped down from his position as Senior Vice President and Global Controller of the Company and assumed a different role at the Company.

**D. Insider Trading**

62. As the Company made false and misleading statements to investors about the adequacy of Kyndryl's internal controls over financial reporting, Defendants Khurana and Sebold sold millions of dollars of Kyndryl stock. On June 3, 2024, Defendant Khurana sold 30,430 shares of Kyndryl common stock, receiving proceeds of $802,244. As part of the transaction, Defendant Khurana exercised 22,930 stock options that were not set to expire until December 31, 2031.

63. On February 6, 2025, Defendant Sebold sold 27,500 shares of Kyndryl common stock and received proceeds of $1,777,782. The same day, Defendant Khurana sold 55,465 shares of Kyndryl common stock and received proceeds of $2,374,491. As part of the transaction, Defendant Khurana exercised 11,465 stock options that were not set to expire until December 31, 2031.

64. On June 2, 2025, Defendant Khurana sold 26,451 shares of Kyndryl common stock and received proceeds of $1,035,359.

65. Finally, on December 5, 2025, Defendant Khurana sold 6,641 shares of Kyndryl common stock and received proceeds of $177,275.

**E. Government Investigations and Officer Exits**

66. Kyndryl disclosed in the Form NT 10-Q that it had received voluntary document requests from the SEC's Division of Enforcement relating to the Company's "cash management practices, related disclosures (including the drivers of the Company's adjusted free cash flow metric), [and] the efficacy of the Company's internal control over financial reporting." The Company has not disclosed when it received the voluntary document requests from the SEC.

67. Certain officers at Kyndryl began facing adverse employment experiences around this time, as well. On February 9, 2026, the Company announced that Defendants Wyshner and

Sebold had departed from their positions as CFO and General Counsel, respectively, as of February 5, 2026. That same day, Defendant Khurana stepped down as Senior Vice President and Global Controller.

68. On February 11, 2026, the Securities Class Action was filed against Kyndryl and Defendants Schroeter, Wyshner, and Khurana. The plaintiff alleges that from August 7, 2024, to February 9, 2026, the named defendants made false and misleading statements about the Company's internal controls over financial reporting in violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5.

**F. Defendants' Misconduct Has and Continues to Harm the Company**

69. As a direct and proximate result of the Defendants' conduct, the Company has been harmed and will continue to be. The harm includes, but is not limited to, the costs already incurred and to be incurred defending the Company in the Securities Class Action. Kyndryl also is the target of an investigation by the SEC concerning the misconduct detailed above. The Company will incur more costs as it complies with the SEC investigation. And the Company has already incurred and will continue to incur costs to remediate the deficiencies in its internal controls over financial reporting.

70. In fiscal years 2024 and 2025, the Company paid more than $50 million in compensation to Defendants Schroeter, Wyshner, and Sebold:

| | **2024** | **2025** |
|---|---|---|
| Defendant Schroeter | $15,661,281 | $15,803,726 |
| Defendant Wyshner | $6,482,557 | $6,148,193 |
| Defendant Sebold | $3,693,683 | $3,443,275 |
| **TOTAL:** | **$25,837,521** | **$25,395,194** |

The Defendants failed to oversee and manage the Company in accordance with their fiduciary duties and Company policies, making the compensation provided by the Company excessive. The Board has not clawed back any of this compensation.

71. Kyndryl's reputation and goodwill have also been damaged by the Defendants' misconduct.

**G. Kyndryl Issues False and Misleading Proxy Statements**

72. In addition to the false and misleading statements discussed above, the Director Defendants also caused the Company to issue false and misleading proxy statements during the Relevant Period, including the Schedule 14A Proxy Statement issued on June 16, 2025 (the "Proxy"), that sought stockholder votes to, among other things, re-elect the Director Defendants to serve on the Board.

73. The Director Defendants drafted, approved, reviewed, and/or signed the Proxy before they were filed with the SEC and disseminated to Kyndryl's stockholders. The Director Defendants negligently issued materially misleading statements in the Proxy. These allegations are based solely on negligence; they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Director Defendants and they do not allege or do not sound in fraud. Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference or any allegation of fraud, scienter, or recklessness with regard to the Proxy allegations and related claims.

74. In support of re-electing themselves, the Director Defendants highlighted their supposed oversight of the Company in the Proxy. The Proxy stated:

> **Board and Committee Oversight of Risk Management**
>
> One of the most significant oversight responsibilities for our Board is with respect to risk management. The Board executes this oversight with a multi-

tiered approach through oversight by the entire Board, as well as through its committees, each of which assists the Board in overseeing a part of our overall risk management and regularly reports to the Board, as discussed below. In that way, risk oversight responsibilities are shared by all committees of the Board, with each committee responsible for oversight of matters most aligned with the responsibilities set forth in its charter. We believe that allocating responsibility to a committee with relevant knowledge and experience provides a more focused and deeper oversight of risk. This allows for a multi-tiered approach to risk oversight, with the full Board retaining overall oversight responsibility.

Our senior leadership team is responsible for managing our enterprise risk management program under the oversight of the Audit Committee, which periodically reviews the Company's enterprise risks and related enterprise risk management framework and processes. Responsibility for managing each of our highest priority risks is assigned to one or more members of our senior leadership team. Line management under the leadership of key senior leaders perform the daily processes, controls and practices of our risk management program. Our enterprise risk management program is designed to identify, assess and manage our risk exposures, and management regularly reports to the Board and its committees on our material operational, strategic and financial risks (over the short-, intermediate- and long-term) and plans to monitor, manage and mitigate these risks, as described below.

Each committee also, when desired by the applicable committee, meets with outside advisors (including consultants and experts) in executing its risk oversight responsibilities.

The Board is responsible for the overall oversight of our enterprise risk management program and receives regular updates from management on our material operational, strategic and financial risks (over the short-, intermediate- and long-term) and plans to monitor, manage and mitigate these risks. With respect to operational and strategic risks, the Board receives periodic updates from: our Chief Information Security Officer, Chief Information Officer, Security & Resiliency global practice leader and other senior leaders with respect to cybersecurity and data privacy matters; our Chief Human Resources Officer on compensation and human capital matters; and our Global Head of Corporate Affairs and Senior Vice President, Global Citizenship & Sustainability with respect to environmental and corporate responsibility matters. The Board considers the foregoing matters so critical to our business that it maintains concurrent oversight over them with its committees.

75. The Proxy thus assured stockholders that the Director Defendants understood Company-wide risks, actively oversaw the Company's risks and exposures, as well as steps taken to monitor and mitigate risk exposures. In reality, the Director Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose or prevent the Defendants from causing the Company to make the materially false and misleading statements detailed herein.

76. As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to re-elect the Director Defendants to the Board.

### H. The Board Breached its Fiduciary Duties

77. As officers and/or directors of Kyndryl, the Defendants owed Kyndryl fiduciary duties of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Kyndryl in a fair, just, honest and equitable manner. The conduct of the Director Defendants involves a knowing or reckless violation of their obligations as directors and officers of Kyndryl, the absence of good faith on their part, and a reckless disregard for their duties to the Company that Director Defendants were aware or should have been aware posed a risk of serious injury to the Company.

78. Defendants, because of their positions of control and authority as directors and/or officers of Kyndryl, were able to and did exercise control over the wrongful acts complained of herein. As officers and/or directors of a publicly-traded company, the Defendants had a duty to prevent the dissemination of inaccurate and untruthful information regarding Kyndryl's financial condition, performance, growth, operations, financial statements, business, management, earnings, internal controls, and business prospects, so as to ensure that the market price of the Company's common stock would be based upon truthful and accurate information.

79. To discharge their duties, the officers and directors of Kyndryl were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors and Kyndryl were required to, among other things:

(a) Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the Company's stockholders;

(b) Conduct the affairs of the Company in a lawful, efficient, business-like manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(d) Oversee public statements made by the Company's officers and employees as to the financial condition of the Company at any given time, including ensuring that any statements about the Company's financial results and prospects are accurate, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e) Remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws;

(f) Maintain and implement an adequate and functioning system of internal controls to ensure that the Company complied with all applicable laws, rules, and regulations; and

(g) Ensure that the Company is operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules and regulations.

80. The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its stockholders, which the Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

81. The Board's Audit Committee is tasked with overseeing Kyndryl's financial reporting system and assisting the Board with its oversight of the adequacy and effectiveness of Kyndryl's internal controls over financial reporting and its disclosure controls and procedures. Specifically, according to the Audit Committee's charter, the Audit Committee's responsibilities include:

- Meet to review and discuss with management and the independent accountant the Company's quarterly financial statements to be included in the Company's Quarterly Reports on Form 10-Q, including the specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), prior to their filing with the SEC. Review the audited financial statements to be included in the Company's Annual Reports on Form 10-K, including the MD&A, prior to their filing with the SEC. Recommend to the Board of Directors that the audited financial statements be included in the Company's Annual Reports on Form 10-K. As part of this review, discuss with senior financial management and the independent accountant the accounting principles as applied. Periodically, discuss with management their approach to earnings press releases and the type of financial information and earnings guidance provided to analysts and rating agencies. Review earnings press

releases and financial results in advance of release as deemed appropriate by the Committee.

- Receive and discuss reports from management on an annual or as needed basis as deemed appropriate by the Committee relating to:
  - Financial and internal controls;
  - Investigations;
  - The Company's use of financial instruments;
  - Litigation and regulatory risks;
  - Tax matters; and
  - Key controls and processes in specific business or functional areas, including cybersecurity, pension management, and tax.
- Maintain procedures for the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters; and for the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

82. In violation of the Audit Committee Charter, and their general duties as members of the Audit Committee, Defendants Caruso, Machuel, and Merchant conducted little, if any, oversight of the Company's internal controls over financial reporting, resulting in materially false and misleading statements regarding the Company's business and consciously disregarded their duties to monitor such controls. The Audit Committee's complete failure to perform their duties in good faith resulted in misrepresentations to the public and the Company's stockholders.

83. In addition, as officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act, the Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information. Accordingly, the Defendants breached their fiduciary duties by knowingly or recklessly causing the Company to make false and misleading statements of material fact about

the Company's maintaining adequate internal controls and compliance with applicable rules and regulations.

84. The Defendants' flagrant violations of their fiduciary duties and unwillingness to heed the requirements of their Audit Committee Charter have inflicted, and will continue to inflict, significant harm on Kyndryl.

## DERIVATIVE ALLEGATIONS

85. Plaintiff brings this action derivatively in the right and for the benefit of Kyndryl to redress injuries suffered by Kyndryl as a direct result of the Director Defendants' breaches of fiduciary duty. Kyndryl is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

86. Plaintiff will adequately and fairly represent the interests of Kyndryl in enforcing and prosecuting the Company's rights.

87. Plaintiff was a stockholder of Kyndryl at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is currently a Kyndryl stockholder.

## DEMAND FUTILITY ALLEGATIONS

88. Plaintiff repeats, re-alleges, and incorporates by reference each and every allegation set forth as though fully set forth herein.

89. The Kyndryl Board currently has 10 members: Defendants Caruso, Harris, Hester, Jackson, Kugel, Machuel, Merchant, Schreuder, Schroeter, and Ungerleider.

90. Plaintiff has not made any demand on Kyndryl's current Board to institute this action against the Director Defendants, as any pre-suit demand would be excused. The Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

91. The Director Defendants had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. In addition, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.

92. The Director Defendants' making or authorization of the false and misleading statements discussed above misrepresented the financial health of Kyndryl. The failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required due diligence, constitute breaches of fiduciary duties that have resulted in the Director Defendants facing a substantial likelihood of liability. The Director Defendants could not fairly and fully prosecute this action or any other action concerning the misconduct described above.

**A. Demand is Excused as to Defendant Schroeter**

93. Defendant Schroeter is the Company's CEO. Defendant Schroeter received compensation of $15,803,726 in 2025. Defendant Schroeter depends on Kyndryl for his income. In addition, Kyndryl stated in the Proxy that Defendant Schroeter is not independent pursuant to NYSE rules.

94. Defendant Schroeter served as a director of the Company during the Relevant Time Period. As a director, Defendant Schroeter had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations,

prospects, internal controls, and financial statements were accurate. Defendant Schroeter was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

95. Defendant Schroeter failed to conduct oversight of the Company's internal controls over financial reporting and the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Kyndryl's controls, Defendant Schroeter failed to protect corporate assets.

96. Defendant Schroeter was an active participant in the misconduct described above. Defendant Schroeter signed the 2025 Annual Report, as well as the Forms 10-Q filed by the Company during the Relevant Time Period. Defendant Schroeter made false and misleading statements concerning Kyndryl's disclosure controls and failed to disclose material weaknesses in the Company's internal controls over financial reporting.

97. In addition, Defendant Schroeter is a named defendant in the Securities Class Action.

98. Thus, Defendant Schroeter faces a substantial likelihood of liability.

**B. Demand is Excused as to Defendant Caruso**

99. Defendant Caruso served as a director of the Company during the Relevant Time Period. As a director, Defendant Caruso had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Caruso was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

100. Defendant Caruso failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By

consciously disregarding the duty to monitor Kyndryl's controls, Defendant Caruso failed to protect corporate assets.

101. According to the Proxy, Defendant Caruso received $365,015 in compensation in connection with his role as a Company director. Defendant Caruso is not otherwise employed. Accordingly, Defendant Caruso cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

102. Defendant Caruso was an active participant in the misconduct described above. Defendant Caruso signed the 2025 Annual Report. Defendant Caruso therefore faces a substantial likelihood of liability.

103. Defendant Caruso served on the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for overseeing reports of the Company's financial results, audit reporting, internal controls, adherence to the Company's code of ethics and compliance with applicable laws and regulations. The Audit Committee was responsible for reviewing and approving Kyndryl's Forms 10-Q and 10-K filed during the Relevant Time Period. Defendant Caruso was thus responsible for knowingly or recklessly allowing the improper statements related to Kyndryl's disclosure controls and material weaknesses in the Company's internal controls over financial reporting.

104. Defendant Caruso knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Caruso breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Caruso faces a substantial likelihood of liability for these breaches, making any demand on Defendant Caruso futile.

**C. Demand is Excused as to Defendant Harris**

105. Defendant Harris served as a director of the Company during the Relevant Time Period. As a director, Defendant Harris had a duty to ensure that the Company's SEC filings, press

releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Harris was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

106. Defendant Harris failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Kyndryl's controls, Defendant Harris failed to protect corporate assets.

107. According to the Proxy, Defendant Harris received $335,015 in compensation in connection with his role as a Company director. Defendant Harris is not otherwise employed. Accordingly, Defendant Harris cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

108. Defendant Harris was an active participant in the misconduct described above. Defendant Harris signed the 2025 Annual Report. Defendant Harris therefore faces a substantial likelihood of liability.

109. Defendant Harris knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Harris breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Harris faces a substantial likelihood of liability for these breaches, making any demand on Defendant Harris futile.

**D. Demand is Excused as to Defendant Hester**

110. Defendant Hester served as a director of the Company during the Relevant Time Period. As a director, Defendant Hester had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Hester was also

required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

111. Defendant Hester failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Kyndryl's controls, Defendant Hester failed to protect corporate assets.

112. According to the Proxy, Defendant Hester received $417,515 in compensation in connection with his role as a Company director. Accordingly, Defendant Hester cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

113. Defendant Hester was an active participant in the misconduct described above. Defendant Hester signed the 2025 Annual Report. Defendant Hester therefore faces a substantial likelihood of liability.

114. Defendant Hester knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Hester breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Hester faces a substantial likelihood of liability for these breaches, making any demand on Defendant Hester futile.

**E. Demand is Excused as to Defendant Jackson**

115. Defendant Jackson served as a director of the Company during the Relevant Time Period. As a director, Defendant Jackson had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Jackson was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

116. Defendant Jackson failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Kyndryl's controls, Defendant Jackson failed to protect corporate assets.

117. According to the Proxy, Defendant Jackson received $335,015 in compensation in connection with her role as a Company director. Accordingly, Defendant Jackson cannot reasonably and objectively consider a demand to sue the Board that controls her continued compensation.

118. Defendant Jackson was an active participant in the misconduct described above. Defendant Jackson signed the 2025 Annual Report. Defendant Jackson therefore faces a substantial likelihood of liability.

119. Defendant Jackson knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Jackson breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Jackson faces a substantial likelihood of liability for these breaches, making any demand on Defendant Jackson futile.

**F. Demand is Excused as to Defendant Kugel**

120. Defendant Kugel served as a director of the Company during the Relevant Time Period. As a director, Defendant Kugel had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Kugel was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

121. Defendant Kugel failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By

consciously disregarding the duty to monitor Kyndryl's controls, Defendant Kugel failed to protect corporate assets.

122. According to the Proxy, Defendant Kugel received $335,015 in compensation in connection with her role as a director. Accordingly, Defendant Kugel cannot reasonably and objectively consider a demand to sue the Board that controls her continued compensation.

123. Defendant Kugel was an active participant in the misconduct described above. Defendant Kugel signed the 2025 Annual Report. Defendant Kugel therefore faces a substantial likelihood of liability.

124. Defendant Kugel knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Kugel breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Kugel faces a substantial likelihood of liability for these breaches, making any demand on Defendant Kugel futile.

### G. Demand is Excused as to Defendant Machuel

125. Defendant Machuel served as a director of the Company during the Relevant Time Period. As a director, Defendant Machuel had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Machuel was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

126. Defendant Machuel failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Kyndryl's controls, Defendant Machuel failed to protect corporate assets.

127. According to the Proxy, Defendant Machuel received $335,015 in compensation in connection with his role as a Company director. Accordingly, Defendant Machuel cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

128. Defendant Machuel was an active participant in the misconduct described above. Defendant Machuel signed the 2025 Annual Report. Defendant Machuel therefore faces a substantial likelihood of liability.

129. Defendant Machuel served on the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for overseeing reports of the Company's financial results, audit reporting, internal controls, adherence to the Company's code of ethics and compliance with applicable laws and regulations. The Audit Committee was thus responsible for reviewing and approving Kyndryl's Forms 10-Q and 10-K filed during the Relevant Time Period. Defendant Machuel was thus responsible for knowingly or recklessly allowing the improper statements related to Kyndryl's disclosure controls and material weaknesses in the Company's internal controls over financial reporting.

130. Defendant Machuel knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Machuel breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Machuel faces a substantial likelihood of liability for these breaches, making any demand on Defendant Machuel futile.

**H. Demand is Excused as to Defendant Merchant**

131. Defendant Merchant served as a director of the Company during the Relevant Time Period. As a director, Defendant Merchant had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Merchant was also

required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

132. Defendant Merchant failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Kyndryl's controls, Defendant Merchant failed to protect corporate assets.

133. According to the Proxy, Defendant Merchant received $335,015 in compensation in connection with his role as a Company director. Accordingly, Defendant Merchant cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

134. Defendant Merchant was an active participant in the misconduct described above. Defendant Merchant signed the 2025 Annual Report. Defendant Merchant therefore faces a substantial likelihood of liability.

135. Defendant Merchant served on the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for overseeing reports of the Company's financial results, audit reporting, internal controls, adherence to the Company's code of ethics and compliance with applicable laws and regulations. The Audit Committee was thus responsible for reviewing and approving Kyndryl's Forms 10-Q and 10-K filed during the Relevant Time Period. Defendant Merchant was thus responsible for knowingly or recklessly allowing the improper statements related to Kyndryl's disclosure controls and material weaknesses in the Company's internal controls over financial reporting.

136. Defendant Merchant knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Merchant breached the fiduciary duty of

loyalty and good faith by participating in the misconduct described above. Defendant Merchant faces a substantial likelihood of liability for these breaches, making any demand on Defendant Merchant futile.

**I. Demand is Excused as to Defendant Schreuder**

137. Defendant Schreuder served as a director of the Company during the Relevant Time Period. As a director, Defendant Schreuder had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Schreuder was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

138. Defendant Schreuder failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Kyndryl's controls, Defendant Schreuder failed to protect corporate assets.

139. According to the Proxy, Defendant Schreuder received $357,515 in compensation in connection with her role as a director. Accordingly, Defendant Schreuder cannot reasonably and objectively consider a demand to sue the Board that controls her continued compensation.

140. Defendant Schreuder was an active participant in the misconduct described above. Defendant Schreuder signed the 2025 Annual Report. Defendant Schreuder therefore faces a substantial likelihood of liability.

141. Defendant Schreuder knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Schreuder breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Schreuder

faces a substantial likelihood of liability for these breaches, making any demand on Defendant Schreuder futile.

**J. Demand is Excused as to Defendant Ungerleider**

142. Defendant Ungerleider served as a director of the Company during the Relevant Time Period. As a director, Defendant Ungerleider had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Ungerleider was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

143. Defendant Ungerleider failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Kyndryl's controls, Defendant Ungerleider failed to protect corporate assets.

144. According to the Proxy, Defendant Ungerleider received $335,015 in compensation in connection with his role as a director. Accordingly, Defendant Ungerleider cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

145. Defendant Ungerleider was an active participant in the misconduct described above. Defendant Ungerleider signed the 2025 Annual Report. Defendant Ungerleider therefore faces a substantial likelihood of liability.

146. Defendant Ungerleider knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Ungerleider breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Ungerleider

faces a substantial likelihood of liability for these breaches, making any demand on Defendant Ungerleider futile.

147. Based on the facts alleged herein, there is a substantial likelihood that Plaintiff will be able to prove that these individuals breached their fiduciary duties by condoning the misconduct and failing to take meaningful action to remedy the resultant harm.

## CLAIMS FOR RELIEF

## COUNT I

### Breach of Fiduciary Duty
### (Derivatively Against The Director Defendants)

148. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

149. Each of the Director Defendants owed and owes Kyndryl the highest obligations of loyalty, good faith, due care, and oversight.

150. Each of the Director Defendants violated and breached their fiduciary duties of loyalty, good faith, candor and oversight to the Company.

151. The Director Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. In breach of their fiduciary duties, the Director Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

152. In addition, the Director Defendants further breached their fiduciary duties owed to Kyndryl by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact and allowing the Company to operate with inadequate internal controls which resulted in the misrepresentations and failure to disclose that

disclosure controls and failures to disclose material weaknesses in the Company's internal controls over financial reporting.

153. The Director Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact, exposing them to personal liability to the Company for breaching their fiduciary duties.

154. The Director Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the wrongdoing set forth herein and to fail to maintain adequate internal controls. The Director Defendants had actual knowledge that the Company was engaging in the wrongdoing set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the wrongdoing and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Director Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

155. As a direct and proximate result of the breaches of duty alleged herein, Kyndryl has sustained and will sustain significant damages.

156. As a result of the misconduct alleged herein, these Defendants are liable to the Company.

157. Plaintiff, on behalf of Kyndryl, has no adequate remedy at law.

## COUNT II

**Breach of Fiduciary Duty**
**(Derivatively Against the Officer Defendants)**

158. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

159. The Officer Defendants are executive officers of the Company. As executive officers, the Officer Defendants owed and owe Kyndryl the highest obligations of loyalty, good faith, due care, oversight, and candor.

160. The Officer Defendants breached their fiduciary duties owed to Kyndryl by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact, failing to disclose weakness in internal controls over financial reporting. The Officer Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact.

161. As a direct and proximate result of the breaches of duty alleged herein, Kyndryl has sustained and will sustain significant damages.

162. As a result of the misconduct alleged herein, the Officer Defendants are liable to the Company.

163. Plaintiff, on behalf of Kyndryl, has no adequate remedy at law.

## COUNT III

**Gross Mismanagement**
**(Against All Defendants)**

164. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

165. By their actions alleged herein, the Defendants abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation

166. As a direct and proximate result of the Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages.

167. As a direct and proximate result of the gross mismanagement and breaches of duty alleged herein, Kyndryl has sustained and will sustain significant damages.

168. As a result of the misconduct alleged herein, the Defendants are liable to the Company.

169. Plaintiff, on behalf of Kyndryl has no adequate remedy at law.

**COUNT IV**

**Waste of Corporate Assets**
**(Derivatively Against All Defendants)**

170. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

171. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Time Period. It resulted in continuous, connected, and ongoing harm to the Company.

172. As a result of the misconduct described above, the Defendants wasted corporate assets by, inter alia: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

173. As a direct and proximate result of the waste of corporate assets and breaches of duty alleged herein, Kyndryl has sustained significant damages.

174. As a result of the misconduct alleged herein, the Defendants are liable to the Company.

175. Plaintiff, on behalf of Kyndryl, has no adequate remedy at law.

## COUNT V

### Unjust Enrichment
### (Derivatively Against the Officer Defendants)

176. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

177. By their wrongful acts, violations of law, and false or misleading statements or omissions of material fact that they caused to be made, the Defendants were unjustly enriched at the expense of, and the detriment of, the Company.

178. The Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price, or received compensation or other payments that were unjust in light of the Defendants' bad faith conduct.

179. Plaintiff, on behalf of Kyndryl, seeks restitution from the Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation based compensation, obtained by the Defendants due to their wrongful conduct and breach of their fiduciary duties.

## COUNT VI

## Violation of Section 14(a) of the Exchange Act (Against The Director Defendants)

180. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

181. The section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. The section 14(a) Exchange Act claims detailed herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

182. The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the Proxy. In the Proxy, the Board solicited stockholder votes to reelect the Director Defendants to the Board.

183. The Proxy, however, misrepresented and failed to disclose the Board's risk oversight and the Company's inadequate internal controls, which facilitated the illegal behavior described herein. By reasons of the conduct alleged herein, the Director Defendants violated section 14(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, Kyndryl misled and deceived its stockholders by making materially misleading statements that were essential links in stockholders following the Company's recommendation and voting to reelect the Director Defendants.

184. Plaintiff, on behalf of Kyndryl, thereby seeks relief for damages inflicted upon the Company based upon the misleading Proxy in connection with the improper reelection of the Director Defendants to the Board.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands judgment as follows:

A. Declaring that Plaintiff may maintain this derivative action on behalf of Kyndryl and that Plaintiff is a proper and adequate representative of the Company;

B. Against all of the Defendants and in favor of Kyndryl for the amount of damages sustained by the Company as a result of the acts and transactions complained of herein;

C. Granting appropriate equitable relief to remedy the Defendants' breaches of fiduciary duties, including, but not limited to the institution of appropriate corporate governance measures;

D. Awarding Kyndryl restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

E. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

F. Granting such other and further equitable relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: March 21, 2026

**ROWLEY LAW PLLC**

*S/ Shane T. Rowley*

Shane T. Rowley (SR-0740)
Danielle Rowland Lindahl
50 Main Street, Suite 1000
White Plains, NY 10606
Tel: (914) 400-1920
Fax: (914) 301-3514
Email: srowley@rowleylawpllc.com
drl@rowleylawpllc.com

*Attorneys for Plaintiff David Brown*

OF COUNSEL:

**BRIAN MURRAY LAW PLLC**
Brian P. Murray (BM 9954)
750 E. Main Street
Suite 620
Stamford, CT 06902
Phone: (203) 883-2170
Email: bmurray@brianmurraylaw.com